Star Packing v. Crown Cork & Seal Good morning, Your Honors. Todd Baxter on behalf of the Morning Star Packing Company and California Fruit and Tomato Kitchen. I'd like to reserve five minutes of my time for rebuttal if I can. I'll try to keep an eye on the clock myself. The main theme that seems to run through this appeal or a majority of the issues in this appeal is that the Court erred in really ending this case so early at the pleading stage, particularly in light of the issues here. And without allowing California Fruit at a minimum the opportunity to file a proposed second amended complaint to add the causes of action for reformation and to include a claim for equitable estoppel in their breach of contract claim. Separate and apart from that, there are issues relating to the original decision to dismiss the first amended complaint that we have briefed as well. The Court only had a limited snapshot of the evidence in this case, particularly when you're talking about the proposed second amended complaint, and was looking at seemingly to resolve the case based on the evidence that was presented as opposed to looking to the fact that this is really at the pleading stage. It seemed as though the Court was pulling out the rug, ending this case a lot faster than it needed to be and should have allowed the parties to file that second amended complaint and move ahead with those claims. Should we talk about reformation? Sure. I can get to reformation. The major or at least a major problem I have on the reformation is good old Mab versus Merriam. I understand. And it's only 107 years old. It's a little older than my father would have been, but never mind. There it sits. And in your brief, you kind of give it the back-of-my-hand approach. But let's – it's really short, so we can parse it really quickly. It is short. The allegations in Mab are, if I've got them right, the plaintiff said she verbally agreed with the defendant that she would exchange lands with the defendant. Correct. The documents are then put together, and it has her husband's name and the defendant's. She really would like to be substituted for her husband, but she certainly would like to have herself put into that contract, because, after all, the agreement, as everybody knew, was between her and the defendant. And lo and behold, her name is left out of the documents. Supreme Court California says, we don't care if that was by mistake, by ignorance, or with knowledge. We just don't care. It's irrevelant. All we know is her name wasn't there, and we ain't going to put it in on reformation. How do we deal with that? Now, you can cite a bunch of other cases, but how do you deal with that? It's never been overturned, and there's never been a case exactly like it. What do we do with it? Well, I think in this instance, the distinction with the Mab case is that you are looking at specifically substituting somebody in. You're taking one out and placing another in. Well, you could say that, but she'd have liked to have been added in anyway, and that didn't work. The Court said, specifically, we can neither add additional parties nor substitute other parties. The Court said, we don't care if she wants to be added or substituted. It just can't happen. That's what they said. Well, let me try to help you out. So where do we go with that? It's 100 years, and there have been some cases that seem somehow to be whittling away at all this, including the one that added the broker, who was not a party, suddenly became a party to this contract. Correct. So, you know, and there's some other cases. It seems clear, at least in my reading of the California cases, although Judge Sotomayor is not a lawyer, there seems to be a movement to a more equitable position here. I noticed you didn't ask, have you thought about maybe the case ought to be certified to the New York and California Supreme Court? We didn't specifically ask for that, Your Honor, under this position, because I think where, and I saw the distinction with the Mab case and where courts were going, and the creation of the Civil Code Section 3399, and how the idea of the beneficial interest, if a third party is supposed to be a beneficial interest, has a beneficial interest in this agreement, that the scope of the agreement can be expanded to include them. We're not asking, and we never argued that, you have to take Morningstar out, and you have to put California Fruit in, because that's really the Mab case. And that's not something that we were referring to. Morningstar was the Mab case. I'm sorry. The Mab case, the idea. Well, I know what it is, but I didn't hear what you just said. Oh, it's taking the Mab case, the idea, I think, in the Mab case, Your Honor, is that you take one out and put another one in. You are substituting. Let's say that's not a good distinction per Mab. And I think where the courts have gone and have gradually eroded that issue, Your Honor, is they are looking at parties who the scope of the agreement was intended to cover them or not cover them. For example, in the Hess v. Ford Motor Company case, they looked at that agreement and the manufacturer tried to say, got a release, the release is broad, it covers the manufacturer as well, and I should be out of this case. And the court went back and said, well, you can we're going to reform this to limit the scope of this. It wasn't intended to be for the manufacturer of the vehicle in this particular instance. And that is, I guess if you were to look at Mab, that would be in some respects changing the terms of creating a different contract, arguably. But what we're talking about here when you're talking about Hess, when you're talking about Cantillay and Calhoun v. Downs, is that when you're, you can expand it to include a party who was, has a pecuniary interest and has a beneficial interest in this. And that is the idea that we are arguing in our case. Those cases don't exactly say that, do they? Because those cases, the parties contracted to have A put in, supposedly, as a third party beneficiary with a blank or whatever you want to say. But I think the district court said, there's nothing here that suggests that Morning Star contracted to have Cal Fruit in there. The argument really is Cal Fruit, like Mrs. Mab says, we were supposed to be in that contract. I mean, we, we, we meant to be in that contract. As opposed to the contracting parties between themselves wanted the person in, Mab's, Supreme Court says to Mrs. Mab, I don't know what you wanted. I don't care what you wanted. You wanted to be in the contract. That's what Cal Fruit wants. It wants to be in the contract, not because somebody, not because Morning Star said, we're making a contract for your benefit, but because it wants to be in the contract. It looks so much like Mab, it's just almost, it's almost eerie. Well, and I don't see it that way, Your Honor. I know. The problem with it is that you have, with Mab, you have a contract that was made for one person. And that person wasn't included in and wants to be substituted in. You have a tolling agreement that was created for both parties. The interchangeability in the discussion between the names and the fact that they are jointly responsible on the supply agreement, the, the idea that both of these parties were meant to be covered by this. It, it, it, it would make. And I have a lot of sympathy for this because I can see what was intended. It was. Here's where I get kind of stuck is that first part of Mab's, I guess you call it the holding, it said. No. The court of equity can neither add additional parties nor substitute. So I appreciate that Mab, Mab was in effect a substitution, correct? But the California Supreme Court said neither add nor substitute. And so. I, I know they said that, Your Honor. But I think the cases that have come along subsequent to that do look at a party that has a beneficial interest. You have a, which California Supreme Court case has come subsequent that we would look to? I don't know that there's a specific California Supreme Court case, but there is cases like Hess v. Ford, Motor Company. The court of appeals cases. It is a court of appeals. See, that, that's a, that's a bit of a problem in that if we only have a court of appeals case as opposed to a Supreme Court case, and our, we have an odd job, as you know, trying to figure out what would, what would California do as a California Supreme Court? Well, why don't we try to squeeze you in under the third-party beneficiary theory? Well, they are, in terms of a beneficial interest, they are a third-party beneficiary. I know, but it's. The intent would be. I mean, they're not quite a broker, but on the other hand, it's clear that your client was intended to benefit from this arrangement. They are. Well, Your Honor, if they, if they were not, would Crown Cork really draft a tolling agreement, enter into this agreement, enter into a confidentiality agreement, ask for all of California Fruit's documents to determine damages, and leave itself exposed to the possibility that they're going to get sued because this tolling agreement doesn't apply to California Fruit? It doesn't make any sense to do it that way. Obviously, when they, and it goes really to the performance of the contract, the history between the parties, the discussion that went on where the termination of the contract, California Fruit responds to the termination of the contract. They respond. As a matter of fact, the termination notice was sent to Morningstar. It wasn't even sent to California Fruit. So there's an interchangeability, there's a history here where Morningstar means also California Fruit. California Fruit means Morningstar. Well. There's an interchangeability in the discussion of these issues. What doesn't make sense is why they weren't included in the first place. And more than that, why in the world, when the complaint was filed, they weren't even included? I mean, that, yeah, it doesn't make a lot of sense that that was intended. But maybe it wasn't intended. I don't know. Well, I think, Your Honor, where it moved to at some point was the belief or thought or maybe that was the mistake on the part of Morningstar and California Fruit, that Morningstar also meant California Fruit. That's what the parties were doing. That's where the struggle comes in, in this case, in a lot of respects, is that there's an interchangeability in talking about these parties. They're all sort of identified as sort of one entity. That's how this developed over time. And so when you came to the point of the original complaint and then they said, well, you know, California Fruit needs to be included in this complaint, this is absolutely right. So we modified that complaint and included them in with allegations that they're supposed to be, they were correspondingly referred to interchangeably among the parties. And I think that's the intent of this tolling agreement was to include California Fruit, even if you're referring to Morningstar. In fact, it is one person on behalf of Morningstar, and it was actually Morningstar Company, that not only signed the tolling agreement, signed the confidentiality agreement, signed the supply agreement, it's all the same person who signed all these agreements on behalf of Morningstar Packing Company and on behalf of California Fruit. Was that the attorney? No. The tolling agreements were signed by the president of Morning Fruit Packing Company, which is the managing partner of Morningstar Packing Limited. Okay. It would have been the same person. It's the same person who signed everything, signed the tolling agreement, signed the confidentiality agreement, signed the supply agreement on behalf of this, I guess, conglomeration of one entity. And, again, it gets back to these are basically the same type of interchangeability of the parties, interchangeability in identifying them and considering them one entity. So when you enter into the tolling agreement, you're referring to Morningstar, and then the person who signs the tolling agreement is Morningstar Packing Company's president, which is a managing partner of California Fruit and is a president of Morningstar Company Limited, and he signs also the confidentiality agreement. He's also the one who signed the supply agreement. It's all the same party that was signing on behalf of all these various entities. It ultimately becomes this interchangeability and the intent of the tolling agreement, as signed by the managing partner, the president of the managing partner of California Fruit, was that it applied to California Fruit as well. I've been able to get to other issues, and I didn't know if there were more questions on this particular point. I'd be happy to discuss this. I think if the Court is thinking of somehow setting this case to send to the California Supreme Court for this reason. I'm only speaking for myself. Well, and maybe it's something, since we had this MAD decision that is over 100 years old, and you've had this various case law coming down, which talks about things such as the beneficiary interest. I reserve your time. I'd like to hear from you. Okay. I will reserve the rest of my time. Thank you, Your Honors. Good morning. Bill Armstrong on behalf of, excuse me, on behalf of Crown Cork and Seal. I was struck by the prior case because, like the attorney who spoke in that one, I'm substituted in. Mr. Rosenthal hasn't passed away, but he prudently decided to retire so he can enjoy his remaining days. So I couldn't ask him if he was pulling a fast one. I think the only thing he might be pulling, Your Honor, is his golf ball at this point. Let me ask you a question right off. Suppose this document had had a line for California fruit, but for some reason it wasn't signed. Then what would be your position? That would be a different case. I think the fact that it did not have a line for California fruit puts it squarely under the MAB analysis. And I don't think MAB is some arcane, ancient rule that we should, you know, look askance at because it has something to do with horses and buggies. The basic concept remains valid in any Reformation discussion. The predicate has to be whether the parties intended something different. And I think what the MAB court said was we are simply not going to countenance the notion that the parties ---- But, Your Honor, coming from a state where this you would never get here because it would be reformed. New York's law is quite contrary. What's the policy argument that why is MAB and good law, and especially in the face of the language of, you know, I find it extraordinary that they reach that result in the face of the language of the California code? It would necessarily be a different contract. The contract between the husband and the other party is a different contract than one between the wife. Why did you engage in these discussions? Because clearly there was no liability on the part of Morningstar here. I mean, you know, no arranger, whatever obligations went to California, to the other company. I think the answer to that question, Your Honor, is based on the record it would seem that Mr. Rosenthal in representing Crown Cork and Seal had come into the matter obviously after the conflict had arisen. He personally would have had no reason to understand which of the two companies on the other side was the one that was going to, if you will, carry the ball in terms of having damages and assert the claim in litigation, one or both. But let's just assume he's operating in good faith, but he puts in one, but in effect the reality is they're one and the same for purposes of this transaction. Why isn't it a technical reformation as opposed to a new contract when they are one and the same for purposes of what we're talking about in the dispute? I understand your question, and there are really two aspects to it. One, Mr. Rosenthal did not draft the tolling agreement or the confidentiality agreement. I don't think there's any question about that from the record. They were drafted by counsel for Morningstar. And the second part of it is that Mr. Rosenthal would have had no reason to dispute his adversary's counsel. What I said to begin with is take Mr. Rosenthal out of it. All right. It doesn't have to do with his conduct at all. Well, let me. We now have this. We have this piece of paper with one name on it, but the parties having, in effect, operated as if they were one and the same. But they haven't operated as if they were one and the same. And that was going to be my second. And let me just recite a bit of the history. Tell me how. Pardon? Tell me how. I would like to do that with reference to the record, because the basic argument that is being made on this point by Morningstar and California Fruit is that there was this history. And let's look at that history. First of all, the supply agreement itself has two signature lines, one for Morningstar and one for California Fruit. And the same individual apparently signed on behalf of both corporations. But there are two corporations, and they're indicated on that document. The initial letter terminating or purporting to terminate the agreement, the letter from Crown to a Mr. Russell, which is at excerpts page 78. It's dated, the date of the letter is January 8th of 2002. It's addressed to Mr. Russell, and then underneath his name it says, Morningstar and then California Fruit. Both companies are specifically identified. Then there is a letter from counsel for California Fruit that's dated January 11th, and that's at excerpts pages 79 and 80. In that letter dated January 11th, he says that he represents California Fruit. He doesn't mention Morningstar. And the argument being made much later is, oh, well, we had this history that whenever we said Morningstar, we meant both. But at the beginning, the first two items after the contract, Crown uses both names. Counsel for California Fruit says, I'm representing California Fruit. Then the next letter is dated February 1st, and that's at excerpts pages 81 and 82. I have to tell you, it's one thing to rely on the Supreme Court precedent, but there was no hearing here. And I have a funny feeling that no judge would find that this was other than, in good faith, they were talking about both. And if they weren't, then the guy was pulling a fast one. Now, you may have the precedent against you, but I just don't buy this argument you're making, that somehow they thought they were drawing this distinction. Because really, if it was with Morningstar, you shouldn't have been talking to him because really there was no liability. Well, let me just continue. In the record, Your Honor, and I think this is in the trial court's order and in the briefs, of course, the first indication is Mr. Rosenthal's letter in March where the only place that he mentions a name other than his own client is he uses the Morningstar name as a subject line. There's nothing in his letter or any of the other correspondence or documents from Crown Cork that suggests that Crown Cork is mixing this up. Wait a minute. Rosenthal comes in much later, right? He comes in in March of 2002. Yes. But the question is what was intended when these agreements were going on and these negotiations were going on. The agreements we're worried about now, the tolling agreement and so on, that was December of 2002. So Mr. Rosenthal was in the loop at that point. So then what we either was operating, I have to tell you, either if he's operating in good faith, he was assuming that both were involved, or he was pulling a fast one. I don't know how anybody could read it otherwise. Well, I think if you look closely at it, there's only four or five pieces of correspondence, Your Honor. And I did look at it. And after that time, then counsel for the other side, if I can just refer to it that way, starts saying I'm representing Morningstar. And the only, you know, I don't know how one can infer one way or the other that the counsel for Crown Cork was either pulling a fast one or simply saying, look, I don't know which of the corporations. I'm sure he didn't even think about it if he was operating in good faith. I'm sure he didn't even think about it. This only becomes later. And at some point, apparently in November, December timeframe, counsel for Morningstar and California Fruit realizes that they need a tolling agreement. They prepare the tolling agreement. And I think we can all understand what undoubtedly happened at that point, is they sent this thing over and asked Mr. Rosenthal to have it signed, which he did. He didn't say, oh, gosh, you know, are you sure you've got the right, you know, do you know who you represent or any of that? There's nothing there. So under MAB, I think the district court was correct in applying California law on that point. But beyond that ---- Let me ask you about that. MAB doesn't make reference to the California statute 3399 about when a contract may be revised. Why wouldn't there be a factual issue here as to whether there was a mutual mistake and whether this section 3399 ought to be invoked? Because, Your Honor, I think, again, we're looking at the question now of whether the trial court abused its discretion in rejecting another amendment to the complaint, I think. And on that point that you ask, I think the trial court gave the plaintiffs below an opportunity to amend. But then when they proffered the amendment, it wasn't only the MAB decision that was troubling the trial court, but also the failure to plead with specificity as required by Rule 9, which, of course, I mean, in the reply brief the appellants say, well, that only applies to fraud, but, of course, it doesn't. It applies to pleading fraud or mistake. It says if you're going to have a pleading of a mistake, you have to plead it with particularity. And that's not done either. So I think the trial court relied correctly on both MAB and on the pleading issue under the Federal rules. But he sought a leave to amend. He sought leave to amend yet again. And I think the trial court had decided, exercised its discretion to say you had enough chances and there's nothing here that you can do. And I don't think that's the case. But the futility, I mean, I guess maybe I read it a little differently so that this is helpful to me, because I thought in effect he was saying it would be futile to amend because of MAB. And it is an abuse of discretion standard. But if he were wrong as a matter of law, then, of course, it would be an abuse of discretion. So if it wouldn't be futile under 3399, why then would we uphold the dismissal? I think the dismissal should be upheld because I really don't see how anyone can defend the complaint that was before the Court at that point. I think the real focus has to be on should that have been amended or should the plaintiffs have been permitted to amend, try again. And I think the district court decided you cannot do this. And you haven't done it. You're drawing a distinction, I take it, from district court. Somebody makes a 12B6, district court dismisses, gives leave to amend. In this situation where the person had leave to amend, said here's my amendment, and the court said that doesn't work, does the court then have to give leave to amend the proposed nonworking amendment, which is a little different from granting a 12B6. Is that what you're saying? I think in effect. I mean, that is we know what happened. I mean, there was a first amended complaint. And I think that one of the points raised in the brief is, look, even if you, plaintiffs, appellants, are saying you didn't realize until Crown's answer was filed that there was going to be this focus on the distinction between the two companies, at least you knew it by then. And then when you filed your first amended complaint, you had an opportunity then to say what you were going to say, and you didn't get it right. And then you came in with a second, a proposed second amended complaint, and that didn't do it either. So on both the federal rules pleading issue and on the MAB issue, I think the district court correctly exercised its discretion. And I think in light of the facts that were before it, the pleadings, there was not a basis on which one could reasonably infer that a mistake was made. Indeed, I would just segue a little bit to another aspect of this, which I think is important, because we all, I think, understand that in order for there to be a reformation, there has to be an underlying agreement that is misstated in the written document. That's, I think, something we all agree on. And yet in the reply brief at page 7, the appellants say very clearly, there was no oral side agreement, and in the context, that is, the side agreement that a reference to Morningstar also meant California Fruit. They have, that's a succinct quote out of a longer discussion, and I'm not taking it out of context. They're very clearly, they're arguing in that segment of the reply brief that we were wrong in claiming that they were asserting that there had been some side agreement. And whether it was a side agreement or some other agreement, they just say there was no such agreement that a reference to Morningstar would include a reference to California Fruit. They go back and forth in their briefs. And I think, again, in support of the trial court's decision here, these, you know, inconsistent descriptions of what they wanted to do and how they saw the history were also before the district court. And I think that had to play into the decision. And you see some of that in the order. The difficulty in this case is if one looks at it sort of cosmically, it sounds too cute by half. Cal Fruit is out because of statute of limitations problems, right? And then Morningstar can't collect because it has no damages. And so we get to the end of this thing, and somebody has been hurt really badly, allegedly. And we say, oh, well, we like the old pleading rules, and you guys have put yourself into a box. Isn't that the trouble with that? I think that one can look at that, and it's clear that's the outcome. And the district court in the order maybe doesn't say it as sympathetically, but he understood the point. And the problem, of course, is that we do have rules. And it's not as though we're dealing with a hapless in pro per plaintiff that just got some minor technicality wrong. We're dealing here with corporations on the appellant side of the case who are presumably sophisticated and represented by counsel. They can read the federal rules, but look at what you have. I mean, I mentioned that Rule 9 applies to mistake. And in their reply brief, they say, well, those cases about the particularity requirements of Rule 9, that's just about fraud. They're just not getting it right. And at what point do you draw the line and say, no, I'm sorry, you may have stumbled here on the rules, but this is a fatal error. But it's not an error that the court can correct by reformation. And that is, I think, as counsel said. If you didn't have this precedent, the statute would be an easy case. The language of the statute is so generous and broad. But I guess you're conceding at least that in no way are you prejudiced if it's changed, right? Well, prejudiced in the sense that you got away with it. Prejudiced in the bottom line. But, no, I think we all understand this is a procedural issue. But I think the nub of it is whether the tolling agreement can be reformed. And I think there are basically three reasons that it shouldn't be. We started off with MAB, and I'm not going to plow that ground again. But the second reason is they haven't pled the issue with particularity as they were required to do. And the third reason is that looking at the correspondence, which is the nub of the case, I don't think it demonstrates in any way that Crown Cork or its counsel made any representation or other statement that can be construed reasonably to have misled opposing counsel as to who opposing counsel represented. And you know that if this were not this case but some tax case, you would not be hearing, oh, well, the corporations are all the same. There are reasons that lawyers set up different entities as different legal entities. There may be a tax reason, some other reason. But this waving of the hand now to say, oh, no, these different companies really all were the same, they may have had common ownership and common management, but they were different entities. And it was the responsibility for their attorney to get right who to put on the complaint as a plaintiff and who to put in the tolling agreement as a party. So it becomes a malpractice lawsuit. Well, what can I say? I mean, it's not for me to judge that, but clearly an error was made and there has been, as we point out in the brief, a very assiduous effort to avoid naming names. But I frankly think that is the alternative explanation here. Thank you. Thank you. Thank you. Reference to the oral side agreement. That was something that they brought up in their brief. And, you know, when you look at reformation, it goes to what the intent of the parties are. We did respond and say there was no oral contract. There was we didn't reach an agreement on how these were going to be referred to each other. That was our only response in that regard. But they were trying to set it up as some sort of understanding agreement contract about how it was going to be referred to. I think we understand that. Okay. I just wanted to clarify that because it's kind of hammering home on the point about this, you know, how we change our position. Our position hasn't changed. When you look at reformation, it goes to the intent of the parties. Is it fair to say that the first time this whole issue was raised was in the answer to the complaint? As I understand it, the answer to the complaint and the reasons for the first amended complaint and why they stipulated to filing of the first amended complaint was that there was a necessity to have the other party involved in the case being California Fruit. California Fruit wasn't named in the original complaint. And the response to that was there's a necessary party that's missing, and that's California Fruit.  But it didn't come up in the context, Your Honor, of we're going to file a motion to dismiss. Okay. Because some contractual limitations clause applies here. And you weren't a part of the tolling agreement. That didn't come up at that time. It was just that a necessary party was missing. There was a stipulation. We added them in. And as part of that, we alleged that there was a tolling agreement. So that was the first step to the gotcha step. It is the first step to the gotcha. I mean, it is sort of a mystery that they wouldn't be in there in the first place since they're the they are the real party. And I do think, Your Honor, that the change, when you see the change to the first amended complaint, the idea, again, and I don't know why it ended up this way, simply because, of course, I think of between these parties as to how they were discussing the fact that it was a joint agreement that required Morningstar to sign as well as California Fruit. The letters that came out, the raise on them were just Morningstar Packing Company from their attorney. Our response to that, even though we had originally said California Fruit is making a claim for damages, which I think alleviates the whole issue of whether this contractual limitations period applies at all. But the intermixing of this back and forth between these letters, and he says there wasn't any intermixing, there is. Their letters refer on their way to Morningstar Packing Company. The termination letter was addressed to Morningstar Packing Company. What happened with California Fruit is when they raised it in their answer that California Fruit is a necessary party and had to be added on. We did amend the complaint and we said as part of that amendment that the parties interchangeably use these names and that the reference to Morningstar is also a reference to California Fruit. Then you get the motion to dismiss. I guess that's the gotcha, Your Honor. You get the motion to dismiss saying, aha, you weren't part of the tolling agreement and your name isn't specifically there, therefore the one-year contractual limitation applies and you didn't file a lawsuit within that period of time, so you're gone. Our response to that was, wait a minute, that's not what was understood among the parties. That wasn't the intent of this tolling agreement. Certainly not the confidentiality agreement that was signed by Morningstar as well. The confidentiality agreement is you want California Fruit's records. They're proprietary confidential records. Clearly the parties understood that one was the same as the other. I'm not saying that the companies are the same and it's just one company, but in essence, we're looking at this as when you're talking about Morningstar, you're talking about California Fruit. They're jointly responsible under this agreement, and that's why when we got the motion to dismiss, that's why there was, for the first time, not multiple times trying to amend our complaint and add reformation, and as they argue, we couldn't get it right. That was the first time we moved to amend to bring in reformation and bring in equitable estoppel, which is a whole separate issue if there isn't any potential for reformation. Certainly equitable estoppel has been alleged, and the second amended complaint could be, if it needed to be, to be amended again, or the court should have allowed us to amend it again. Particularly under Federal Rule of Civil Procedure 9, if for some reason they thought that the complaint itself, the proposed second amended complaint, wasn't enough or had a lot of the basics there but didn't have the rest that was necessary, we should have been allowed the opportunity to amend that complaint again, particularly to add in something like more for equitable estoppel or different aspects of reformation. We were just at the tip of the iceberg, as I said at the beginning. We were just really at the tip of the iceberg on the evidence. No depositions were taken. There wasn't evidence as to how the parties interchangeably used these names except for the use of these letters. We should have been given that opportunity to bring that complaint, to seek reformation, to bring equitable estoppel as well. I'm out of time, Your Honor. Thank you. Thank you very much. We have your arguments in mind from both parties. Thank you. Morningstar v. Crown Cork is submitted and we will adjourn for the morning.
judges: Fernandez, McKeown, Trager